**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR 03-1167-PHX-DGC |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER** |
| Robert Johnston, et al., | ) ) | |
| Defendants. | ) ) ) | |

Pending before the Court are the following motions: Defendant Robert Johnston's Motion to Suppress (dkt. 977); the Joint Motion to Quash Search Warrant filed by Defendants Shaefer and Johnston (dkt. 980); and Defendant Donald Smith's Motion to Suppress Evidence from Search and Request for *Franks* Hearing (dkt. 982). The Government filed responses (dkts. 1047, 1049, and 1059, respectively), to which Defendants Johnston and Smith filed replies (dkts. 1146, 1168.)

**BACKGROUND**

On January 19, 2005, a second superceding indictment was filed charging Defendants with, *inter alia*, racketeering under the Racketeer Influenced and Corrupt Organization Act ("RICO"), in violation of 18 U.S.C. § 1962(c), and RICO conspiracy, in violation of 18 U.S.C. § 1962(d). (Dkt. 541.) From December 2001 through July 2003, a multi-agency task force, headed by the Bureau of Alcohol Tobacco and Firearms ("ATF"), conducted an investigation of the activities of the Hells Angels Motorcycle Club ("HAMC"). The task

1    force identified Defendants Johnston, Schaefer, and Smith as HAMC members who

2    participated in racketeering activities.

3        On July 2, 2003, United States Magistrate Judge David K. Duncan issued a warrant

4    authorizing officers to search a number of locations associated with HMAC members,

5    including the residences of Defendants. The warrants were supported by a 117-page affidavit

6    drafted by ATF Special Agent Joseph Slatella. (<u>See</u> dkt. 980, Exhibit A.) The warrants were

7    executed on July 8, 2003.

8        Defendants Johnston and Smith have moved to suppress evidence obtained during the

9    searches of their homes.  They allege that the Slatella affidavit contained deliberate

10   omissions and deliberately false and material information, and request an evidentiary hearing

11   pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  (Dkts. 977, 982.)  Defendant Smith

12   also contends that the affidavit was not sufficiently particularized, that it relied on stale

13   information, that it failed to establish a nexus between his home and the items to be seized,

14   that it violated his First Amendment right of association, and that it was not reviewed by a

15   neutral and detached magistrate.  (Dkt. 982.)  The joint motion of Defendants Schaefer and

16   Johnston further seeks to quash the search warrant on the grounds that it fails to establish a

17   nexus between the criminal activities described in the affidavit and Defendants' homes.

18   (Dkt. 980.)

19       For the reasons set forth herein, the Court will deny Defendants' motions. The Court

20   also finds that Defendants have failed to meet their burden with respect to a <u>Franks</u> hearing.

21                                        **ANALYSIS**

22   **I.     <u>Franks</u> hearing.**

23       In <u>Franks</u>, the Supreme Court "held that in certain narrow circumstances a defendant

24   may go beyond the facial sufficiency of an affidavit supporting a warrant, and challenge the

25   truthfulness of the factual statements made therein."  <u>United States v. Chesher</u>, 678 F.2d

26   1353, 1360 (9th Cir. 1982).  An affidavit in support of a search warrant is presumed valid.

27   <u>Franks</u>, 438 U.S. at 171.  In allowing for hearings to challenge the validity of an affidavit,

28

the Franks court "was careful . . . to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith." Chesher, 678 F.3d at 1360.

A defendant seeking a Franks hearing must satisfy a two-part test.[1]  First, he must make a "substantial preliminary showing" that the affidavit contained actual falsity, and that the falsity either was deliberate or resulted from a reckless disregard for the truth.  Id. (citing Franks, 438 U.S. at 171.)  A challenge to the validity of the affidavit cannot be conclusory and "must be supported by more than a mere desire to cross-examine."  Franks, 438 U.S. at 171.  The defendant's allegations must be accompanied by a "detailed offer of proof."  Chesher, 678 F.3d at 1360.  When alleging deliberate falsehoods or a reckless disregard for the truth, "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  Franks at 171; see United States v. Furrow, 229 F.3d 805, 815 (9th Cir. 2000) (defendant's failure to make a "substantial showing" on the issue of intentional falsity precluded a Franks hearing), overruled on other grounds, United States v. Johnson, 256 F.3d 895, 913 (9th Cir. 2001); United States v. Ruddell, 71 F.3d 331, 334 (9th Cir. 1995); Chesher, 678 F.2d at 1362.

Second, the defendant must show that the challenged statement or omission was material – i.e., necessary to the finding of probable cause.  Chesher, 678 F.2d at 1362 (citing Franks, 438 U.S. at 171–172).  The defendant must show "that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause."  United States v. Stanert, 762 F.2d 775, 782 (9th Cir. 1985).

---

[1]     In United States v. DiCesare, 765 F.3d 890, 894–895 (9th Cir. 1985), amended on other grounds, 777 F.2d 543 (9th Cir. 1985), the Ninth Circuit formulated the following test: "There are five requirements for a sufficient motion for a *Franks* hearing: (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause."

1    "The movant bears the burden of proof and must make a substantial showing to

2    support both elements." United States v. Chavez-Miranda, 306 F.3d 973, 979 (9th Cir. 2002)

3    (citing United States v. Garcia-Cruz, 978 F.2d 537, 540 (9th Cir. 1992)).

4        **A.    Defendant Johnston.**

5        Defendant Johnston asserts that Agent Slatella's affidavit is false or misleading in its

6    characterization of the activities of the HAMC as "wholly illegitimate" and its failure to

7    include information undermining the credibility of the cooperating witness ("CW").  (Dkt.

8    977 at 3–4.)  Johnston also claims that the affidavit contains numerous specific inaccuracies

9    regarding his activities.  (Id. at 7–14.)

10        The Court finds that Johnston has failed to make a substantial showing that the

11    challenged portion of the Slatella affidavit were actually false and that Agent Slatella

12    knowingly provided false information or did so with a reckless disregard for the truth.

13        In the "Training and Experience" section of his affidavit Agent Slatella attested that,

14        I believe that the HMAC . . . in the State of Arizona is a criminal racketeering
15        enterprise . . . and that such a large portion of the enterprise's activities are
         illegitimate that they can be considered, in effect, wholly illegitimate.  I
16        believe that racketeering activities and other criminal acts are pervasive
         throughout the HAMC . . . and have been since the before the inception of this
17        investigation.

18    (Dkt. 980, Ex. A at 107.)

19        This expression of Agent Slatella's opinion follows a lengthy and detailed description

20    of allegedly illicit activities, predominantly the possession and sale of weapons and narcotics,

21    engaged in by named members and associates of the HAMC, including Defendants Johnston,

22    Schaefer, and Smith.  As discussed below, this information distinguishes the Slatella affidavit

23    from those found invalid in United States v. Rubio, 727 F.2d 786 (9th Cir. 1983).  The

24    opinion nature of this statement also seriously undermines Johnston's contention that Agent

25    Slatella deliberately misled Judge Duncan.

26        To meet his burden under Franks, Johnston has attached a deposition transcript in

27    which an Agent Jay Dobyns acknowledged that the HAMC is a "legitimate" organization in

28

the sense that it is "real," "exists," and is "formalized" (dkt. 977, ex. 6 at 19), and that its members share an interest in motorcycles and the "party lifestyle" (id. at 17).  Agent Dobyn's concessions regarding the existence of the HAMC and the interests of its members does not make Agent Slatella's statement of his own opinion false or misleading.  In fact, Agent Slatella's affidavit contains a lengthy description of the club's history, structure, and activities (dkt. 980, ex. A at 26–36).  This information and the other facts attested to in the affidavit provided an adequate context within which the magistrate judge could evaluate Agent Slatella's conclusion that the HAMC is wholly illegitimate.  Johnston has failed to show that Agent Slatella's statement of his opinion with respect to the HAMC's legitimacy was deliberately false.

Moreover, Defendant Johnston has failed to establish that Agent Slatella's opinion was material to a finding of probable cause.  As noted above, the second element of the Franks test requires a defendant to show that the challenged portion of the affidavit was necessary to a finding of probable cause.  Stanert, 762 F.2d at 782.  Given the detail of the affidavit as described above and in the sections of this order that follow, the Court concludes that the affidavit satisfies the probable cause requirement even if Agent Slatella's "wholly illegitimate" opinion is disregarded.

Johnston next challenges Agent Slatella's omission from the affidavit of information concerning drug abuse and criminal activity by a confidential witness ("CW").  (Dkt. 977 at 5–7.)  If this information had been included, Johnston argues, the magistrate would have found CW unreliable and the affidavit deficient.

Agent Slatella's affidavit explained that the task force had engaged in an undercover investigation of the HAMC; this investigation utilized CW, as well as several undercover ATF agents and a registered confidential informant ("CI").  (Id. at 3.)  Between December 2001 and November 2002, CW, holding himself out as a member of another motorcycle gang, monitored phone calls and meetings and purchased guns and drugs from HAMC members.  (Id. at 23–24.)

- 5 -

Case 2:03-cr-01167-DGC   Document 1223   Filed 02/15/06   Page 6 of 23

The affidavit did not disclose that CW was using methamphetamine during the investigation or that he was arrested in November 2002 and found to be in possession of methamphetamine. Defendant Johnston notes that the same magistrate judge who approved the search warrants was subsequently assigned through unrelated court procedures to determine release conditions for CW (apparently without knowing that the person before him was the CW Agent Slatella had referred to in his affidavit) and specifically found that, as a methamphetamine user, CW was "inherently unreliable and untrustworthy." (Dkt. 977, Ex. 2.)

Even if it is assumed that Defendant Johnston has made a sufficient preliminary showing that CW's drug use was a fact deliberately or recklessly omitted from the affidavit, he still must show that is was material – that the affidavit would not have established probable cause for the search of Defendant Johnston's house if the information was discredited by CW's methamphetamine use. The Court concludes that Defendant Johnston has not made this showing.

If the information obtained from CW is disregarded, the affidavit contains the following information about Defendant Johnston:

1.     Several undercover UCs began posing in July of 2002 as "outlaw" members of the "Solo Angeles" motorcycle club, a legitimate motorcycle club based in Tijuana, Mexico. (Dkt. 980, Ex. A at 23.)

2.     Between approximately August of 2002 and November of 2002, the UCs had dozens of meetings and conversations with HAMC members and associates in Arizona and held themselves out as being interested in conducting criminal activities in Arizona. (Id. at 24, 67-75.)

3.     Specifically, the UCs purchased numerous firearms and quantities of suspected narcotics, including methamphetamine and marijuana, from HAMC members. (Id. at 24.)

4.   On August 1, 2002, the UCs met with Defendant Johnston and other HAMC members and observed each HAMC member to be armed with handguns and combinations of knives and other fighting weapons.  (Id. at 71.)

5.   Defendant Johnston, who was president of the Mesa Chapter of the HAMC, advised the UCs that they were his personal guests and the guests of the HAMC Mesa Chapter in the State of Arizona.  (Id.)

6.   On August 13, 2002, the UCs met with HAMC Mesa member, Alexander Davies, at the Mesa Chapter clubhouse and gave him an envelope containing $500, explaining that the money was to be delivered to Defendant Johnston as an expression of thanks for Johnston's sanctioning of the UCs' illegal firearm trafficking activities in Arizona.  (Id. at 73.)

7.   On November 13, 2002, one of the UCs – designated as M1 in the affidavit – met with Defendant Johnston.  Defendant Johnston told M1 that the HAMC controls the state of Arizona for all motorcycle club related business, that the Solo Angeles are his guests in Arizona, and that he (Johnston) has his finger in everything.  Johnston then telephoned another HAMC member in Cave Creek, Arizona, and advised that the Solo Angeles were his guests in Arizona.  (Id. at 73.)

8.   On November 14, 2002, several UCs were at the HAMC Mesa clubhouse and saw Defendant Johnston remove from his HAMC vest or waist area a blue steel large caliber handgun.  Defendant Johnston has a prior felony conviction and is a prohibited possessor.  (Id. at 74.)

9.   On March 14, 2003, M1 met with Defendant Johnston at the HAMC Mesa Chapter clubhouse and reported that the UCs had completed every task asked of them by Johnston in order to maintain good standing with the HAMC. Johnston advised M1 that the HAMC had supported the Solo Angeles stronger than their own club had.  (Id. at 74.)

10.     On June 12, 2003, two of the UCs – M1 and C1 – were advised by HAMC member George Walters that they were to travel to Las Vegas, Nevada to assist in protecting a motorcycle club coalition meeting, that the UCs should anticipate being in an armed confrontation, that the UCs should bring their firearms and other weapons, and that Defendant Johnston had sent several members of the HAMC Mesa Chapter to the location.  (Id. at 75.)

11.     On December 11, 2002, M1 had a discussion with Defendant Johnston at a Waffle House restaurant in Tempe, Arizona.  The conversation concerned CW, who was then in prison.  Johnston told M1 that CW had used Johnston's name in prison to enhance CW's reputation, that CW is not a "snitch" but that he talks too freely, that Johnston could "get to" the person that owned the firearm in CW's possession when he was arrested (for which he was then incarcerated) to make sure the person told CW's attorney that the firearm was his and not CW's, that he was aware that the Solo Angeles had been conducting business (criminal firearms and narcotics transactions) with other HAMC members, and that the Solo Angeles needed to be careful and not conduct too much business too fast, as this is dangerous and can make those involved vulnerable.  (Id. at 69.)

The Court concludes that this information, none of which came from CW, is sufficient to establish "a fair probability or substantial chance of criminal activity" on the part of Defendant Johnston.  See United States v. Bishop, 264 F.3d 919, 924 (9th Cir. 2001) (citing Illinois v. Gates, 462 U.S. 213, 235 (1983)).  In addition to this information, a decision regarding the existence of probable cause is based on the "totality of the circumstances" set forth in the search warrant affidavit.  Id.  Thus, in assessing the existence of probable cause regarding Defendant Johnston, the magistrate judge was free to consider the other information set forth in Agent Slatalla's 117-page affidavit.  Because the Court concludes that the affidavit provided probable cause to search Defendant Johnston's residence even if

CW's information is disregarded, Defendant Johnston has not satisfied the second element required for a <u>Franks</u> hearing – that the information related to CW was necessary to the finding of probable cause.  See <u>Chesher</u>, 678 F.2d at 1362.  Stated differently, Defendant Johnston has not shown "that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." <u>Stanert</u>, 762 F.2d at 782.

The Ninth Circuit has held that the reckless omission of information that impeaches an informant is not material under <u>Franks</u> where the affidavit contains sufficient information independent of that provided by the informant.  <u>United States v. Bennett</u>, 219 F.3d 1117, 1124–25 (9th Cir. 2000) (citing <u>United States v. Meling</u>, 47 F.3d 1546, 1553 (9th Cir. 1995)). In <u>Bennett</u>, the court noted that law enforcement monitored and debriefed the informant, thereby verifying his account of his activities, which consisted of hand-to-hand drug purchases. <u>Id.</u> at 1125.  The affidavit at issue in <u>Bennett</u> also included information gathered from other sources, including other informants and an undercover agent.  <u>Id.</u>  Despite the fact that the affidavit omitted information that the informant "perjured himself, lied, had been arrested, and failed to pay income tax," the Ninth Circuit concluded that the defendant was not entitled to a <u>Franks</u> hearing.  <u>Id.</u>[2]

---

[2]    In his affidavit, Agent Slatella provided the following statement in support of the reliability of the information obtained through confidential informers such as CW: "In all instances where the informants or witnesses have provided information, the information has been corroborated by one or more investigative procedures, including the review of historical police reports, the review of telephone rosters and pen register call and subscriber data, undercover operative activities and observations, physical surveillance, independent informant and/or witness statements, and numerous other investigative techniques . . . No informant or witness information relied upon has been found to be false or misleading. Therefore, in all instances where informant or witness information is referred to herein, the information has been found to be true and credible, and therefore reliable."  (Dkt. 980, Exhibit A at 3–4.)

1    Finally, the Court finds that Johnston has not met his burden under <u>Franks</u> with

2    respect to any of the specific factual challenges raised in his motion.  Johnston has failed to

3    show that any of the contested statements or omissions, which relate to subjects such as

4    HAMC structure and policy or consist of interpretations of events that Johnston disputes,

5    were actually false or that Agent Slatella included or excluded such information deliberately

6    or recklessly.  Moreover, in light of the volume of detail set forth in the affidavit regarding

7    interactions between the UCs and Defendant Johnston, as well as information obtained by

8    the UCs about Defendant Johnston, the Court concludes that Johnston has not established the

9    materiality of the specific factual assertions he challenges.

10        **B.     Defendant Smith.**

11    A similar analysis applies to the factual disputes which form the basis of Defendant

12    Smith's request for a <u>Franks</u> hearing.  (Dkt. 982 at 18–21.)  Smith characterizes as

13    deliberately or recklessly false a number of statements contained in the affidavit.  The Court

14    disagrees with this characterization.  Smith asserts, for example, that the affidavit was

15    misleading because it did not explicitly state that he was not a "prohibited possessor" of

16    firearms.  (<u>Id.</u> at 20.)  But the affidavit included a section outlining each suspect's criminal

17    history and indicating that Smith had no felony convictions on his record.  (Dkt. 980, Ex. A

18    at 9.)  Having provided this information, it cannot be said that Agent Slatella intentionally

19    misled the magistrate into believing Smith was a prohibited possessor.

20    Elsewhere Smith, like Johnston, disputes Agent Slatella's account of certain events.

21    For example, with respect to a report that Defendant authorized the use of intimidation or

22    violence in the collection of a debt, Defendant simply states that "Counsel believes this

23    statement to be untrue."  (<u>Id.</u> at 19.)  Because such allegations of untruthfulness are wholly

24    conclusory and unsupported by an offer of proof, Smith has failed to meet his burden under

25    <u>Franks</u>.

26

27

28

                                    - 10 -

1    **II.     Probable cause.**

2          **A.     Nexus.**

3          In their joint motion to quash the search warrant, Defendants Schaefer and Johnston

4    contend that Agent Slatella's affidavit failed to establish probable cause to search their homes

5    because it did not show a nexus between those locations and the criminal activity being

6    investigated and because the information in the affidavit was stale. (Dkt. 980.)   Defendant

7    Smith raises similar arguments. (Dkt. 982.)  The Government counters that the information

8    set forth in the affidavit established probable cause and, alternatively, that the officers

9    executing the warrant acted in good faith pursuant to United States v. Leon, 468 U.S. 897

10   (1984).  (Dkts. 1049 at 5, 1059 at 8.)

11         "Probable cause exists when there is a fair probability or substantial chance of

12   criminal activity."  Bishop, 264 F.3d at 924.  A decision regarding the existence of probable

13   cause is based on the "totality of the circumstances" set forth in the search warrant affidavit.

14   Id.  An issuing judge's determination of probable cause is afforded "great deference" by

15   reviewing courts.  United States v. Alvarez, 358 F.3d 1194, 1203 (9th Cir. 2004) (citing

16   Gates, 462 U.S. at 236).

17         "When a judge issues a search warrant for a residence, he must find a 'reasonable

18   nexus' between the contraband and the residence."  Chavez-Miranda, 306 F.3d at 978.

19   Direct observation or other direct evidence placing the item in the location to be searched is

20   not necessary to establish probable cause.  United States v. Angulo-Lopez, 791 F.2d 1394,

21   1399 (9th Cir. 1986); United States v. Poland, 659 F.2d 884, 897 (9th Cir. 1981).  As the

22   Ninth Circuit noted in United States v. Fernandez, 388 F.3d 1199, 1253 (9th Cir. 2004), "We

23   have repeatedly held that an issuing magistrate may draw reasonable inferences about where

24   evidence is likely to be kept, based on the nature of the evidence and the type of offense

25   alleged."  When undertaking such an analysis, "a magistrate may rely on the conclusions of

26   experienced law enforcement officers regarding where evidence of a crime is likely to be

27   found."  Id. (quoting United States v. Terry, 911 F.2d 272, 275 (9th Cir. 1990)).  For

28

example, as explained in <u>Angulo-Lopez</u>, a judge is allowed to draw the reasonable inference that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." 791 F.2d at 1399.

The Ninth Circuit has offered this description of the applicable standard, which requires only a "fair probability" that evidence will be found in a particular place:

> For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

<u>United States v. Peacock</u>, 761 F.2d 1313, 1315 (9th Cir.1985) (emphasis in original, citations omitted), <u>overruled on other grounds by Gomez v. United States</u>, 490 U.S. 858 (1989)); <u>see</u> <u>Fernandez</u>, 388 F.3d at 1254.

In his affidavit, Agent Slatella states that, based on his experience investigating outlaw motorcycle gangs, evidence of the type sought in the search warrant, including firearms, records of illicit activities, and indicia of gang membership, is frequently kept in a suspect's home for a long period of time.  (Dkt. 980, Ex. A at 107–11.)  The affidavit states that Schaefer, Johnston, and Smith are "full-patch" members of the HAMC.  It further indicates that Johnston was the HAMC Mesa Chapter President (<u>id.</u> at 67) and that he would have been responsible for "maintaining certain club documents" (<u>id</u> at. 29).  The affidavit notes that Johnston has prior felony convictions for "criminal enterprise, RICO, and felon in possession of a firearm" (<u>id.</u> at 7) and is therefore a "prohibited possessor" of firearms (<u>id.</u> at 74).

As recounted in detail above, the portions of the affidavit based on information not provided by CW suggest that Defendant Johnston was the President of the Mesa Chapter of the HAMC, that he understood the UCs were part of an outlaw motorcycle club seeking to engage in criminal conduct in Arizona, that he welcomed the UCs as his personal guests in Arizona and informed other HAMC members of that fact, that he carried a firearm as a prohibited possessor, that he sent armed HAMC members to a potential confrontation, that

1  he said he "had his fingers in everything," and that he gave advice to the UCs about how to
2  conduct their criminal activities in Arizona.

3       With respect to Schaefer, the affidavit indicates that the UCs met with him at the Mesa
4  clubhouse on January 22, 2003, at which time he stated that he was involved in firearms
5  trafficking.  (Id. at 94.)  On January 29, 2003, he again stated that he was interested in
6  pursuing firearms transactions with the UCs.  (Id.)  On February 12, 2003, Schaefer sold a
7  Ruger 9mm semi-automatic pistol to undercover agent M3 for $300.  (Id. at 97.)  During a
8  meeting on January 25, 2003, Schaefer told undercover agent M3 that he had been involved
9  in the "Laughlin shooting" and expected to receive prison time as a result.  (Id. at 95.)  On
10 February 11–12 and 18–19, 2003, Schaefer and M3 engaged in transactions in which
11 Schaefer sold M3 methamphetamine, in amounts of 1/8 and 1/16 ounce, respectively.  (Id.
12 at 95–98.)  During all of the encounters described in the affidavit, Schaefer wore an HAMC
13 vest and carried a handgun.  (Id. at 94–98.)

14      The affidavit indicates that on August 9, 2002, Defendant Smith, a member of the
15 Nomad chapter of the HAMC, met with the UCs in Bullhead City, Arizona.  (Id. at 98-99.)
16 M1 observed Smith provide co-defendant David Denbesten with a handgun; as he did so
17 Smith acknowledged that he was aware that Denbesten was a convicted felon.  (Id. at 98.)
18 At the meeting, Smith indicated that he had access to illegal firearms and could assist the
19 Solo Angeles in purchasing firearms.  (Id. at 99.)  Smith informed the UCs that the reason
20 he left California was because he had committed arson there, destroying a bar, the adjoining
21 business, and a number of motorcycles.  (Id.)  Smith stated that he controlled Bullhead City
22 for the HAMC.  (Id.)

23      On August 23, 2002, the UCs met with Smith at his residence, which displayed
24 assorted HAMC paraphernalia.  (Id.)  Smith asked M1 to collect a debt for him and
25 authorized M1 to use any amount of violence or intimidation necessary to get the job done.
26 (Id.)  Smith and Denbesten indicated that they were often asked to assist in business dealings
27 by using intimidation based upon their HAMC membership.  (Id. at 99–100.)
28

On November 7, 2002, M1 and M4 met Smith at his residence where he "displayed a Mossberg .12 gauge shotgun, a Winchester .12 gauge shotgun, and an Intratec 9mm or .380 caliber pistol." (Id. at 100.) On December 1, 2002, M1 met with Smith at Smith's residence, where he observed approximately five bulletproof vests. During the meeting Smith sold M1 a Taurus 9mm semi-automatic pistol for $450. (Id. at 101–02.) On January 8, 2003, CI met with Smith at Smith's residence, where he purchased a Cobray 9mm semi-automatic pistol for $450. (Id. at 102.) Later that day Smith provided CI with a MAK-90 7.62 caliber rifle; CI took possession of the rifle and paid Smith's wife $500 the next day. (Id.)

On February 1, 2003, CI and M1 met with Denbesten and Smith at a Phoenix-area restaurant. Smith, who was carrying semi-automatic pistol, advised M1 that, after the arrest of a fellow HAMC Nomad member, he, Smith, was carefully guarding the firearms he had in storage. (Id. at 103.) He also told M1 that he had been elected Nomad Vice President; M1 observed the Vice President patch on Smith's vest. (Id.) At the meeting Denbesten sold CI approximately 1/16 ounce of methamphetamine. (Id.) The transaction took place within Smith's view. (Id.) Before the completing the transaction Denbesten told the CI that he had to "wait for Smitty." (Id. at 102–03.)

On March 8, 2003, M1 spoke on the telephone with a number of HAMC members, including Smith. (Id. at 104–5.) M1 thanked them for giving permission to Billy Schmidt, another member, to engage in firearms and drug transactions with the UCs. (Id. at 105.) Smith replied that he was seeking to "make that type of thing permanent" (i.e., to have the UCs become HAMC members and engage in criminal activities). (Id.) On June 21, 2003, in Williams, Arizona, Smith and M1 discussed a prospective murder-for-hire transaction. (Id. at 105.) Smith indicated that he believed M1 could handle the murder. (Id.)

From the information provided throughout the affidavit, it was reasonable for the magistrate to infer that Hells Angels paraphernalia and records, as well as other forms of contraband, might be present in the residences of Johnston, Schaefer, and Smith. According to Agent Slatella, as Mesa chapter president Johnston had a variety of bookkeeping

responsibilities, so it was reasonable to search his residence for the type of documentary evidence enumerated in the affidavit.  Also, given the fact that he was seen carrying a handgun and was a prohibited possessor, it was reasonable to seek evidence of such a weapon at his home.  With respect to Schaefer, a nexus between his home and contraband was established through information provided by the UCs, who purchased narcotics and weapons directly from Schaefer.  Similarly, the UCs observed that Smith's home contained firearms and HAMC regalia.  Based on the information provided in the affidavit, the Court concludes that it was "reasonable to seek the evidence in the place indicated in the affidavit" – the homes of Defendants Johnston, Smith, and Schaefer.  Peacock, 761 F.2d at 1315.

**B.    Staleness.**

The timeliness of a search warrant depends on whether it is reasonable to believe that the items to be seized are still on the property.  See United States v. Gann, 732 F.2d 714, 722 (9th Cir.); United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) ("Staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought").  The mere lapse of substantial amounts of time is not controlling.  See United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir.1993).  Moreover, "[w]hen the evidence sought is of an ongoing criminal business of a necessarily long-term nature . . . rather than that of a completed act, greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time."  Greaney, 929 F.2d at 525; see United States v. Foster, 711 F.2d 871, 878 (9th Cir. 1983) (upholding the validity of an "affidavit [that] sought evidence of a large-scale, ongoing criminal organization, not evidence relating to a completed criminal act").  Therefore, "[o]ne may properly infer that equipment acquired to accomplish the crime and records of the criminal activity will be kept for some period of time."  Id. (citing United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir.1988)).

With respect to Johnston, the most recent information discussed in the affidavit (information dated June 12, 2003) was less than one month old when the warrant was executed on July 8, 2003.  (Dkt. 980, Ex. A at 74.)  The last reference to Schaefer concerned

a drug transaction on February 19, 2003, approximately four and one-half months before the execution of the warrant.  (Id. at 98.)  According to the affidavit, Smith said in March of 2003 that he was seeking to make the UCs' criminal activity permanent in Arizona, and he discussed a murder-for-hire transaction on June 21, 2003, less than one month before the warrant was executed.  (Id. at 104-05.)

Given the scale of the organization and the ongoing nature of the offenses being investigated, these time periods are not sufficient to render the information contained in the affidavit stale.  As the Ninth Circuit explained in <u>Fernandez</u>, a case involving an investigation of the New Mexican Mafia, "this Court has concluded that in cases involving ongoing narcotics business, lapses of several months – and up to two years in certain circumstances – are not sufficient to render the information in an affidavit too stale to support probable cause."  388 F3d at 1254; <u>see</u> <u>Greany</u>, 929 F.2d at 525 (two-year lapse did not render information stale); <u>Foster</u>, 711 F.2d at 878 (evidence of drug transactions occurring fifteen months prior to the issuance of a search warrant was not stale where evidence also linked the defendant to a drug sale occurring three months prior to the issuance of the search warrant).

The Court finds that the information provided in Agent Slatella's affidavit provided "good reasons" to believe that evidence of the type sought by the warrant was still present at the Johnston, Schaefer, and Smith residences.  <u>Gann</u>, 732 F.2d at 722.

### C.      Confidential informants

Defendant Smith argues that the Slatella affidavit fails to support a finding of probable cause because it does not include information establishing the reliability of the confidential informants or the credibility of the information they provided.  (Dkt. 977 at 10–11.)  Smith cites the two-pronged <u>Aguilar-Spinelli</u> test, which the Supreme Court expressly abandoned in <u>Gates</u>, 462 U.S. at 238.  Under <u>Gates</u>, an informant's reliability and basis of knowledge are among the "totality of circumstances" a magistrate evaluates when determining the existence of probable cause.  Id.; <u>see</u> <u>Angulo-Lopez</u>, 791 F.2d at 1396 ("Evidence bearing

on the veracity of the informant and his basis of knowledge is considered together with other relevant evidence in making the probable cause determination based on the totality of the circumstances").

Agent Slatella's affidavit sets forth information supporting the reliability of the CW and CI and of the information they provided.  First, the affidavit contains a section explaining that all of the information supplied by CW and CI had been corroborated and verified.  (Dkt. 980, Ex. A at 3–4.)  This supports a showing that the informants were credible.  See Angulo-Lopez at 1397 ("an informant's reliability may be demonstrated through independent police corroboration of the information provided").  Second, the affidavit makes clear that CW and CI gained much of their information through direct observation and interaction with Defendants, thereby providing support for the basis-of-knowledge factor.  See United States v. Patayan Soriano, 361 F.3d 494, 507 (9th Cir. 2004) ("detailed, first-hand observations satisfy the basis of knowledge component").  Additionally, much of the information produced by the investigation was gathered by undercover ATF agents, who were in a position to make their own observations as well as corroborating the activities of CW and CI.

The Court concludes that the information set forth in the search warrant supports the reliability of CW and CI under the Gates totality-of-the circumstances standard.

**III.    Particularity.**

Defendant Smith argues that the search warrant violated the prohibition against general warrants by failing to specify the crimes for which Smith was being investigated (dkt. 982 at 7–8) and by failing to describe with particularity the items that were subject to seizure (id. at 12–13).[3]

The Fourth Amendment prohibits "general warrants."  Andresen v. Maryland, 427 U.S. 463, 480 (1976) (citing Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).  A

---

[3]    Smith does not challenge the particularity of any of the specific categories of items listed in Attachment B, but instead characterizes the entire list as overbroad. (Dkt. 982 at 13.)

- 17 -

1   search warrant must "state with reasonable particularity what items are being targeted for

2   search or, alternatively, what criminal activity is suspected of having been perpetrated."

3   United States v. Bridges, 344 F.3d 1010, 1017 (9th Cir. 2003) (citing Marron v. United

4   States, 275 U.S. 192, 196 (1927)).  The warrant authorizing the search of Defendant Smith's

5   residence included an "Attachment B" that listed 18 categories of items to be seized.  (Dkt.

6   1048, Ex. B.)  If these items are described with sufficient particularity, the warrant is valid

7   despite not including the alternative list of the crimes for which Defendant Smith was being

8   investigated.

9          Items must be described in a search warrant with enough specificity to enable the

10  person conducting the search to identify the things authorized to be seized.  See United States

11  v. Silva, 247 F.3d 1051, 1057 (9th Cir. 2001); United States v. Spilotro, 800 F.2d 959, 963

12  (9th Cir.1986).  The specificity required depends on the circumstances of the case and the

13  type of items involved.   Spilotro, 800 F.2d at 963. "Warrants which describe generic

14  categories of items are not necessarily invalid if a more precise description of the items

15  subject to seizure is not possible," id., and "technical precision of detail is not required,"

16  United States v. Gomez-Soto, 723 F.2d 649, 653 (9th Cir. 1984).  Moreover, "[w]hile a

17  search warrant must describe items to be seized with particularity sufficient to prevent a

18  general, exploratory rummaging in a person's belongings, it need only be reasonably specific,

19  rather than elaborately detailed." United States v. Rude, 88 F.3d 1538, 1551 (9th Cir. 1996)

20  (internal quotation marks and citations omitted); see United States v. Hayes, 794 F.2d 1348,

21  1354 (9th Cir. 1986).

22         Applying these principles, courts have found search warrants to be insufficiently

23  particular where, for example, the government failed to set forth the "suspected criminal

24  activity" or "did not limit the scope of the seizure to a time frame within which the suspected

25  criminal activity took place." United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995).  While

26  the warrant here did not specify the crimes for which Smith was being investigated, the list

27  of items to be seized provided sufficient information to indicate that the areas of suspected

28

- 18 -

criminal activity included firearms trafficking and illegal narcotics, and in categories A through J the warrant authorized the seizure only of evidence relating to those offenses. (Dkt. 1048, Ex. B.)  In addition, with respect to the categories which sought records regarding the membership and activities of the HAMC, these items were time-limited to include only information dating from January 2002 to the present.  (Id.)  Attachment B also specified, where possible, the particular objects and documents to be seized within each category.

The Court finds that "the warrant set[] out objective standards by which executing officers can differentiate items subject to seizure from those which are not."  Spilotro, 800 F.2d at 963; see Gomez-Soto, 723 F.2d at 652–54.  Therefore, the warrant described the items to be seized with sufficient particularity.

**IV.   Indicia evidence: Rubio.**

Citing United States v. Rubio, 727 F.2d 786, Defendant Smith argues that the search warrant violated his First Amendment right to freedom of association by authorizing a search for indicia of his membership in the HAMC.  (Dkt. 982 at 14–16.)  In Rubio, the magistrate judge had issued warrants authorizing the search for "indicia of membership in or association with the Hell's Angels."  727 F.2d at 790.  The affidavits in support of the warrants described the types of indicia customarily kept by HAMC members and included specific facts showing each individual's association with the group.  Id. at 704.  The warrants also indicated that a grand jury indictment had been returned charging the defendants with RICO violations.  Id.  But the affidavits contained neither "a statement of probable cause to believe that any defendant had conducted the affairs of the Club through a pattern of racketeering activity" nor any "facts tending to support such a statement."  Id.  The Ninth Circuit held that the affidavits' "mere recitation of the indictment" failed to establish any nexus between the indicia evidence sought in the warrant and the alleged RICO violations; therefore, the affidavits did not support a finding of probable cause.  Id.

1    The court also observed that "[i]f such a large portion of the subject organization's

2  activities are illegitimate so that the enterprise could be considered, in effect, wholly

3  illegitimate, then there would certainly be cause to believe that evidence of a suspect's

4  association with that enterprise would aid in a RICO conviction." Id. at 793.  Because the

5  affidavits in Rubio failed to make such a showing with respect to the legitimacy of the

6  HAMC, however, they were required to provide a nexus between the indicia evidence and

7  criminal activities. Id. at 74; see United States v. Brown, 951 F.2d 999, 1003 (9th Cir. 1991)

8  (affidavit failed to show either that the police unit under investigation was so corrupt that its

9  activities were wholly illegitimate or that the defendants were connected to illegal acts).

10   Agent Slatella's affidavit is distinguishable from those found invalid in Rubio.  Along

11  with information linking Smith and the other suspects to the HAMC and describing the

12  indicia evidence kept by HAMC members, the affidavit contains a lengthy recitation of facts

13  describing the HAMC's racketeering activities and connecting Smith to those activities.[4]

14  (Dkt. 980, Ex. A at 98–105.)  The Slatella affidavit more closely resembles the affidavit

15  approved by the Tenth Circuit in United States v. Killip, 819 F.2d 1542, 1550 (10th Cir.

16  1987).  In Killip, the court held that the because the affidavit "lists facts . . . that tend to

17  support the conclusion that the Outlaws Motorcycle Club is a RICO enterprise and that

18  association with the enterprise may be illegal," it supplied the "missing element in Rubio,

19  probable cause to believe that the evidence sought is connected with a violation of the RICO

20  statute." Id.

21

22

23

24  ────────────────────

   [4]    The fact that the affidavit included information supporting the type of nexus that was
25  lacking in the Rubio affidavits renders moot the parties' debate over whether the activities
   of the HAMC can in fact be considered "wholly illegitimate."  Rubio requires such a
26  showing only when the affidavit fails to "provide probable cause to believe that the subject
   has conducted the affairs of the enterprise, at least in part, through a pattern of racketeering
27  activity."  727 F.2d at 794.
28

1    Because Agent Slatella's affidavit offered a nexus between the indicia evidence

2    sought in the warrant and the criminal activities for which the suspects, including Defendant

3    Smith, were being investigated, it established probable cause to search for those items.

4    **V.    Neutral and detached magistrate.**

5    Defendant Smith argues that he was deprived of his Fourth Amendment right to a

6    determination of probable cause by a neutral and detached magistrate. (Dkt. 982 at 16–18.)

7    First, Smith asserts that Judge Duncan did not have time to review Agent Slatella's lengthy

8    affidavit. Smith reaches this conclusion based on the fact that the date and time at which the

9    warrant was signed, 12:00 p.m. on July 2, 2003, is the same as that at which the affidavit was

10   sworn. (Id. at 17.) The most logical interpretation of that timing, however, is that Judge

11   Duncan read the affidavit before swearing Agent Slatella as to its contents and signing the

12   warrant, a not uncommon practice. (See Dkt. 1059, Ex. 2 at 22.)

13   Smith's second argument is that Judge Duncan was prevented from undertaking a

14   detached and neutral review of the affidavit because of its "cumulative" or "omnibus" nature.

15   (Dkt. 982 at 17–18.) According to Smith, the inclusion of information pertaining to

16   numerous other suspects had a contaminating effect on Judge Duncan's neutrality and

17   rendered it impossible for him to make independent judgments as to probable cause with

18   respect to each suspect. (Id.)

19   As the Supreme Court has explained, a magistrate who issues a warrant "must meet

20   two tests. He must be neutral and detached, and he must be capable of determining whether

21   probable cause exists for the requested arrest or warrant." Shadwick v. City of Tampa, 407

22   U.S. 345, 350 (1972). Smith has offered no support for the proposition that a magistrate

23   cannot perform a neutral and detached review of a lengthy or complex search warrant

24   affidavit. Cf. United States v. Holland, 884 F.2d 354, 357 (8th Cir. 1989) ("mere fact that

25   the magistrate issued four warrants simultaneously based on similar affidavits does not

26   provide evidence of lack of neutrality or detachment"). Nor has he provided any reason to

27

28
                                          - 21 -

1    believe that Judge Duncan was incapable of determining whether probable cause existed with

2    respect to the suspects listed in Agent Slatella's affidavit.

3    **VI.    Good faith exception: <u>Leon</u>.**

4            The Government contends that, even if the Slatella affidavit was insufficient to

5    establish probable cause, it fell within the good-faith exception established in <u>United States</u>

6    <u>v. Leon</u>, 468 U.S. 897 (1984).  In <u>Leon</u>, the Supreme Court held that the exclusionary rule

7    does not preclude the use of evidence "obtained by officers acting in reasonable reliance on

8    a search warrant issued by a detached and neutral magistrate but ultimately found to be

9    unsupported by probable cause."  <u>Id.</u> at 900.

10           As discussed above, there is no evidence that Agent Slatella acted in bad faith.  There

11   is no credible evidence that Judge Duncan abandoned his neutral judicial role.  The warrant

12   was issued by a proper authority.  And the affidavit was not "so lacking in indicia of probable

13   cause as to render official belief in its existence entirely unreasonable."  <u>Id.</u> at 923; <u>see</u>

14   <u>United States v. Fowlie</u>, 24 F.3d 1059, 1067 (9th Cir. 1994).  Therefore, the officers' reliance

15   on the warrant was, as required by <u>Leon</u>, objectively reasonable.  <u>See</u> <u>United States v.</u>

16   <u>Mendonsa</u>, 989 F.2d 366, 369–70 (9th Cir. 1993); <u>Brown</u>, 951 F.2d at 1004-7.

17                                          **CONCLUSION**

18           Agent Slatella's search warrant affidavit established probable cause to search

19   Defendants' residences and it described the items to be seized with sufficient particularity.

20   The warrant was issued by a detached and neutral magistrate and the officers executing the

21   warrant relied on it in good faith.  Finally, Defendants have failed to meet their burden with

22   respect to a <u>Franks</u> hearing.

23           **IT IS ORDERED:**

24           1.      Defendant Robert Johnston's Motion to Suppress (Dkt. 977) is **denied**.

25           2.      Defendants Shaefer and Johnston's Joint Motion to Quash Search Warrant

26                   (Dkt. 980) is **denied**.

27

28
                                            - 22 -

1    3.    Defendant Donald Smith's Motion to Suppress Evidence from Search and

2          Request for <u>Franks</u> Hearing (Dkt. 982) is **denied**.

3    DATED this 15th day of February, 2006.

_____

David G. Campbell
United States District Judge